## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------x
HOLLY GREGORY, MATTHEW POTTER,
and ASTRID HALTEN, individually and on
behalf of all others similarly situated,


                              Plaintiffs,

          v.

STEWART'S SHOPS CORPORATION,


                              Defendant.
-------------------------------------------------x
```

Civil Action No. 7:14-cv-00033 (TJM/ATB)

**VIA ECF**

## DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND COLLECTIVE ACTION

JACKSON LEWIS P.C.
18 Corporate Woods Boulevard
Albany, NY 12211
William J. Anthony
Vincent E. Polsinelli
Stephanie L. Goutos
Peter M. Torncello
*Attorneys for Defendant*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................ 1

FACTUAL BACKGROUND ............................................................................................ 3

    A.  Stewart's Business Operations ............................................................................ 3

    B.  Stewart's Timekeeping Policies .......................................................................... 4

    C.  Plaintiffs' Misplaced Reliance on the Company's Alarm Reports ..................... 6

    D.  There Is No Company-Wide Policy Requiring Employees to Report to Work
        Early For Shifts without Compensation ............................................................ 11

    E.  Stewart's Policies and Practices Regarding Employee Uniforms ..................... 12

    F.  No Contract Existed Regarding Paid Breaks ................................................... 12

    G.  Plaintiffs' Narrowed Call-In Pay Claims Relating to Plaintiff Gregory ......... 13

    H.  Stewart's Compliance with the NYS Wage Theft Prevention Act ................... 14

ARGUMENT ................................................................................................................. 15

I.  PLAINTIFFS' MOTION SHOULD BE DENIED BECAUSE IT SEEKS
   CERTIFICATION OF CLASSES WHICH ARE IMPERMISSIBLE FAIL-SAFE
   CLASSES AND ARE OTHERWISE UNASCERTAINABLE. ............................ 15

    A.  Plaintiffs' Proposed Classes Constitute Impermissible Fail-Safe Classes ...... 15

    B.  Plaintiffs' Proposed Classes Are Unascertainable for Additional Reasons ..... 16

II.  EVEN IF THE COURT DETERMINES THAT PLAINTIFFS' CLASSES
    ARE NOT BARRED AS IMPERMISSIBLE FAIL-SAFE CLASSES AND
    ARE OTHERWISE ASCERTAINABLE, PLAINTIFFS STILL CANNOT SATISFY
    THE REQUIREMENTS OF FED. R. CIV. P. 23(A) OR 23(B). ......................... 19

    A.  Plaintiffs Have Not Cited Sufficient Evidence to Establish Numerosity Under
        Rule 23(a)(1) .................................................................................................. 222

    B.  Plaintiffs Cannot Demonstrate Commonality Under Rule 23(a)(2) ................. 22

    C.  Plaintiffs Cannot Demonstrate Typicality and Adequacy ................................ 25

    D.  Plaintiffs Cannot Satisfy the Requirements of Rule 23(B)(3) .......................... 27

        i.  Plaintiffs Cannot Show That Common Issues Predominate ..................... 27

        ii.  Plaintiffs Cannot Demonstrate Superiority .............................................. 31

III. THE OVERTIME CLASS DOES NOT QUALIFY FOR CERTIFICATION
    UNDER THE FLSA BECAUSE THEY ARE NOT SIMILARLY SITUATED...................32

CONCLUSION..........................................................................................................................35

## PRELIMINARY STATEMENT

The Supreme Court, in *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011), set a high standard for class certification under Federal Rule of Civil Procedure 23 ("Rule 23"). Following this decision, the Second Circuit made clear that, for Rule 23 class certification, a plaintiff must establish that "the most important question[s] in [the] litigation" can be "answered with generalized proof." *Glatt v. Fox Searchlight Pictures, Inc.*, 811 F.3d 528, 539 (2d Cir. 2016) (vacating district court's Rule 23 class certification order). Plaintiffs' Memorandum of Law in Support of Class Certification and Collective Action ("Plaintiffs' Memorandum") fails to contain any citation or mention of *Dukes* or *Glatt*. Apparently hoping that this Court will ignore this established precedent, Plaintiffs cite to pre-*Dukes* standards inapplicable to their motion.

Plaintiffs' motion asks this Court to apply the less rigorous pre-*Dukes* standard and bind together thousands of employees despite the fact that the three named Plaintiffs are not even similar to *each other*, let alone the thousands of other employees whom they seek to represent.[1] For a host of factual and legal reasons, Plaintiffs' motion falls far short of meeting the requisite burden.

Preliminarily, before even addressing the essential requirements of Rule 23(a), it is clear that Plaintiffs' fatally overbroad and ill-defined proposed classes are barred as impermissible fail-safe classes and are otherwise not ascertainable.[2] Moreover, even if the improper classes proposed by Plaintiffs could survive these initial hurdles, class certification would still be inappropriate

---

[1] *See, e.g.,* Dkt. 41 (granting Defendant's motion to dismiss Gregory's overtime claims, but denying motion as to Halten's and Potter's overtime claims, and denying Defendant's motion as to Gregory's call-in pay claims, but granting motion on all remaining call-in pay claims).

[2] Plaintiffs define their Rule 23 classes as all individuals "who: (a) have been denied overtime compensation under State and Federal Law, (b) have been denied 'gap' time pay for off the clock work under State law, (c) have been denied uniform maintenance pay under State law, (d) have been subjected to wage disclosure violations pursuant to New York Labor Law 195.1, (e) have suffered as a result of defendant's breach of its promise regarding paid breaks to its employees, and (f) have been denied call-in pay under State law." Dkt. 63.

because Plaintiffs fail to demonstrate with adequate evidentiary proof that they can satisfy any of the requirements of Rule 23. First, Plaintiffs fail to offer sufficient evidence to establish Rule 23(a)(1)'s numerosity requirement. Second, there is no commonality within each class because, among other things, no Company policy or practice exists which answers the questions underlying the claims as each putative class member's claims vary widely leading to a range of different outcomes.[3] Third, the named Plaintiffs cannot demonstrate that their claims are typical or that they are adequate class representatives for numerous reasons, including the disparate nature of their individual employment histories and the unique facts underlying each of their claims, as well as credibility issues arising from contradictory and unreliable sworn statements that they presented to the Court. Fourth, the classes cannot meet the predominance requirement of Rule 23(b)(3) because legal issues raised in the Complaint and Plaintiffs' unwieldy class definitions require addressing a host of disparate factual circumstances that have no common or unifying resolution. Fifth, a class action is not the superior method of litigating this case because the issues of both liability and damages would, again, require individualized analyses of unique facts and circumstances, including the credibility of individual testimony and recollections rendering a class-based trial completely unmanageable.

For these reasons and the additional reasons discussed below, this Court should reject Plaintiffs' attempts to ignore and evade the rigors of Rule 23, and deny Plaintiffs' motion for class certification. Additionally, for many of the very same reasons – i.e., because Plaintiffs have not demonstrated (and cannot demonstrate) that a proposed class of employees are similarly situated to the named Plaintiffs with respect to their purported federal overtime claims, Plaintiffs' motion

---

[3] For example, in ruling on Defendant's 12(b)(6) motion, this Court had to analyze each week in which each Plaintiff alleged that they were not paid for all hours worked. *See* Dkt. 41.

for conditional certification under the FLSA should be denied as well.

## FACTUAL BACKGROUND

### A.  Stewart's Business Operations

Stewart's Shops Corporation ("Stewart's" or the "Company") is a convenience store chain based in Saratoga Springs, New York, with 300-plus shops located across upstate New York and southern Vermont.  *See* Polsinelli Dec., Ex. 1, Carnevale Dec., ¶6.[4]  Stewart's employs over 4,500 employees in their shops, plants, distribution center, and corporate offices.  *Id., ¶*5.  Currently, approximately 4,000 partners (or clerks) are employed in Stewart's stores.  *Id.*, ¶13.  The Company believes in sharing ownership with the people who built the business and feels that employee ownership is critical to the Company's growth and profitability.  *See* Ex. 2, Carnevale Dep. 16. Stewart's employees own one-third of the Company.  *Id.*

The Company's 300-plus stores vary in a number of material ways, including but not limited to geographic location, hours of operation, products and services offered, and revenue generated.  *See* Ex. 1, Carnevale Dec., ¶¶7-8.  For instance, some stores are located in relatively remote rural locations (*e.g.*, the West Carthage, NY store where Gregory worked), while other stores are in more urban areas.  *Id*., ¶7.  There are also significant differences in the products and services offered at different store locations.  For example, while some stores are equipped to sell gas, others are not.  *Id*., ¶12.  Similarly, there are notable variations in the food products offered at different stores – *e.g.*, some stores have recently begun selling items such as pizza or sandwich wraps, while others have not.  *Id.*, ¶8.  These substantial differences between stores result in disparate work experiences for partners in different stores.  *See, e.g.,* Ex. 5, Potter Dep. 87-88,

---

[4]  Unless otherwise noted, all citations to the record evidence contained herein, including supporting declarations and relevant portions of deposition transcripts, refer to the numbered exhibits attached to the accompanying Declaration of Vincent E. Polsinelli ("Polsinelli Dec.").

146-47, 209-10 (noting differences in the various stores in which he worked).

### B.  Stewart's Timekeeping Policies

Stewart's is committed to paying its employees in full compliance with applicable law for all compensable working time.  *See* Ex. 1, Carnevale Dec. ¶ 15.  Consistent with this commitment, the Company has established policies and procedures for properly and accurately recording time worked by its employees, as described in greater detail below.  *Id.*

Initially, a weekly schedule is prepared at the store level in advance of a given workweek, which lists the anticipated shifts that each employee is scheduled to work.  *See* Polsinelli Dec., Ex. 6, p. 19.  Thereafter, it is a well-established Company-wide policy that these weekly schedules are to be changed to reflect the hours that are actually worked by each store employee.  *Id.*  This Company-wide policy is communicated to all employees in numerous ways, including but not limited to the Company's "Partner Understanding Sheet."  *Id.*  Further, this policy is routinely followed in every store, as demonstrated by even a cursory review of Plaintiffs' time records.

Upon hire and at various other times during their employment, all partners are provided with copies of the Company's "Partner Understanding Sheet," which states "[s]o that you are paid accurately we ask each partner to change the schedule to reflect the hours they actually worked."  *See* Ex. 1, Carnevale Dec., ¶ 20 and Ex. A.  Notably, during their depositions, each of the named Plaintiffs specifically acknowledged receiving and signing multiple copies of this document during their employment with Stewart's.  *See* Ex. 3, Gregory Dep. 106 (signed two); Ex. 4, Halten Dep. 50-51 (signed three); and Ex. 5, Potter Dep. 44-45 (signed four).

In addition to these Partner Understanding Sheets, Stewart's timekeeping policy is also specifically referenced on multiple versions of the Company's work schedules, stating "Partners adjust schedule to show actual hours worked!"  *See, e.g.,* Ex. 5, Potter Dep. 149-50.  Similarly, Stewart's Personnel Manual further emphasizes this policy, instructing employees "[s]o that you

are paid for all the time you worked, please update any changes in start/stop times on the posted schedule." Ex. 1, Carnevale Dec., ¶21. Moreover, both during orientation and throughout a partner's employment, managers consistently explain the procedure for partners to change the schedule to accurately reflect their hours worked.[5] Once the schedules are properly modified to reflect the actual hours worked, those documents represent an accurate record of the total hours worked by store employees in a given workweek, and it is the Company's policy to pay employees in full for all such hours. *See* Polsinelli Dec., Ex. 6, p. 20.

Each of the named Plaintiffs testified that they understood that the Company's policy instructs employees to change the store schedule to reflect their actual hours worked. *See, e.g.,* Ex. 3, Gregory Dep. 122-23; Ex. 4, Halten Dep. 55; and Ex. 5, Potter Dep. 44, 57-58, 72. And each of them also admitted that there were a number of occasions on which their store schedules were, in fact, changed to accurately reflect their actual hours worked. *See* Ex. 3, Gregory Dep. 77; Ex. 4, Halten Dep. 57, 116, 120-21, 147; and Ex. 5, Potter Dep. 61-62, 70, 105-06, 126-28. While Gregory and Halten alleged that, at times, their individual store managers deviated from this Company policy, Potter admitted that no manager ever told him not to change the schedule, that he could not change the schedule, or that he would not get paid for any of the time that he worked.

---

[5] *See, e.g.,* Ex.13, Becker Dec., ¶7 ("[u]pon hire, a manager explained the procedure to me for changing the schedule to accurately reflect my hours worked, if needed"); Ex. 15, Bryant Dec., ¶7 ("it is common practice to change the schedule to reflect your hours worked. I feel that it is my responsibility as an employee to make sure that my hours are accurate."); Ex. 19, Cummings Dec., ¶ 7 ("I was always encouraged to accurately report my time"); Ex. 23, Dugan Dec., ¶7 ("[d]uring training, I was told that if I work a different time period than on the schedule I should change the schedule to accurately reflect my hours. I was always encouraged to accurately report my time"); Ex. 29, Green Dec., ¶9 ("I always change the schedule to accurately reflect my hours worked"); Ex. 38, McLaughlin Dec., ¶8 ("[a]s a shift supervisor, I constantly remind my partners to change the schedule if they need to in order to accurately reflect their time worked"); *see also* Ex. 34, Husfelt Dec., ¶ 7; Ex. 22, Doran Dec., ¶ 7; Ex. 30, Greene Dec., ¶ 7; Ex. 56, Zinnershine Dec., ¶ 7; Ex. 27, Fishlock Dec., ¶ 7; Ex. 44, Runberg Dec., ¶7; Ex. 8, Angeles Dec., ¶7; Ex. 40, Obermier Dec., ¶¶8-9; Ex. 51, Vaughn Dec., ¶7.

*See* Ex. 5, Potter Dep. 148, 157.

Indeed, Potter conceded that, when he opted not to change the schedule, it was because he "wasn't really worried about the time" and was "more worried about getting home after closing than changing the schedule." *See Id.* at 71-72.  Potter further acknowledged that some of his co-workers were more concerned about accurately changing the schedule and identified one of his co-workers as a "stickler" for changing the schedule. *Id.* at 177-78.  Additionally, Potter testified that it only took a "couple of seconds" to change the schedule before leaving for the night, but that the schedule could also be changed at any other point during the week. *Id.* at 149, 179-80.

Notwithstanding these candid admissions during his deposition, Potter has now offered a declaration in support of Plaintiffs' certification motion stating that "I occasionally made changes to the schedule but knew that Stewart's often disciplined people who worked additional time then [sic] scheduled because according to Stewart's this was the employee's fault for not being productive enough." *See* Dkt. 63-16, p. 44, ¶ 14.  But when questioned about this very statement during his deposition, Potter could not identify a single instance in which a Stewart's employee was ever disciplined for working additional time – e.g., suspended, written up, subjected to a reduction in pay, or subjected to any other type of negative action.[6]  *See* Ex. 5, Potter Dep. 199-200 (testifying in response to questions about the same declaration submitted in support of this motion).  Despite Potter's testimony confirming that he had no evidentiary support for this sworn statement, Plaintiffs still chose to present the Court with an unaltered version of his declaration.

### C.  Plaintiffs' Misplaced Reliance on the Company's Alarm Reports

In an effort to bypass the well-established timekeeping policies and practices discussed

---

[6]  At most, Potter testified that the employee's manager might have a discussion with him or her to find out why the work took longer than expected. *See* Ex. 5, Potter Dep. 199-200.

above, in support of their claims for "off-the-clock" work when a store is opened or closed, Plaintiffs now rely almost exclusively on store alarm reports to argue that employees worked more hours than the Company's time records reflect.  But this reliance is misplaced for several reasons.

Most importantly, the store alarm reports are *not* payroll records and are not used by Stewart's as such; nor does the Company have any obligation to do so.  *See* Ex. 1, Carnevale Dec. ¶24; Ex. 5, Potter Dep. 76 (testifying that, "as far as I know," alarm reports are not used for payroll purposes); *see also White v. Baptist Mem'l Health Care Corp.*, 699 F.3d 869, at *7-8 (6th Cir. 2012) (stating that it "would not be reasonable to require that the [employer] weed through non-payroll . . . records to determine whether or not its employees were working beyond their scheduled hours" and that "[t]his is particularly true given the fact that the [employer] has an established procedure for overtime claims that Plaintiffs regularly used") (citations and quotation marks omitted); *Fairchild v. All American Check Cashing, Inc.*, 811 F.3d 776, 782-83 (5th Cir. 2016) (finding that plaintiffs' computer usage reports were insufficient to put employer on notice that an employee was working off the clock and that there was no liability for off-the-clock work where the plaintiff did not follow correct time reporting procedures).[7]  In fact, Potter admitted during his deposition that, as a management trainee and assistant manager for Stewart's, he was never trained "to use alarm reports as any kind of scheduling or payroll device" and did not even know that such reports existed during his employment.  *See* Ex. 5, Potter Dep. 75-76.

Moreover, the alarm reports are completely unreliable as evidence to show compensable

---

[7] The *Fairchild* decision is consistent with other Circuit Courts of Appeal that have ruled on this same issue.  *See, e.g., Green v. FedEx*, 614 Fed. Appx. 905, 908 (9th Cir. 2015) (denying certification of the plaintiff's off-the-clock claims because the plaintiff's proposed "common method of proof, electronic scans of packages" was not sufficient to put FedEx on notice of off-the-clock work); *Hertz v. Woodbury County*, 566 F.3d 775, 781-82, 84 (8th Cir. 2009) (finding that employer was not required to review its electronic data for payroll purposes to determine whether employees working remotely were working off the clock).

working time for store employees.  As Potter accurately admitted, these reports offer no indication as to which employee triggered the alarm.[8]  *See id*. at 74-75.  Potter further conceded that there is simply "no way of knowing" whether or not the employee setting the alarm was actually performing work right up until the time that he or she set the alarm – rather than, for example, sitting around and having a cup of coffee or making personal phone calls.  *Id.* at 75.

Even if, as Plaintiffs suggest, the use of store alarm reports were entertained as some indication of employee working time (which they absolutely should not be), that would spawn an intensely individualized analysis of the unique facts surrounding each and every instance in which an employee opened or closed a store.  Such facts would include, among other things, whether the employee was, in fact, the person who set or deactivated the alarm in that instance, how late or early the employee was initially scheduled to work, whether the employee began working immediately after deactivating the alarm (when opening) or stopped working immediately before setting the alarm (when closing), whether or not they changed the schedule to reflect their actual time worked (and, if so, whether they changed it accurately), and, if they failed to change the schedule consistent with Company policy, why not.  *Compare* Ex. 3, Gregory Dep. 30-31, 44 (alleging that she was told by her store manager (with whom she had been long-time friends) not to change the schedule) *with* Ex. 5, Potter Dep. 71-72 (admitting that he did not change his time because he "wasn't really worried" about it and "was more worried about getting home").

Moreover, conducting such an individualized analysis of the Company's alarm reports will undoubtedly suggest that some employees were working fewer hours than the Company's time records indicate and, thus, were potentially being overpaid.  Notably, this is true of some of the

---

[8]  Similarly, there is no way of knowing whether the alarm was set by a store employee rather than a security or maintenance worker for the Company.  *See* Ex. 2, Carnevale Dep. 129.

opt-in plaintiffs and/or declarants relied upon by Plaintiffs.  For instance, in her declaration in support of Plaintiffs' present motion, Dawn Freemire (also an opt-in plaintiff) alleges that "[w]hen I worked the opening shift I routinely worked 15 minutes or more without compensation."  *See* Dkt. 63-16, p. 25, ¶ 11.  But a comparison of the time records and alarm reports for Ms. Freemire's store suggest that she opened the store *after* her scheduled starting time on the vast majority of days.  In fact, such a comparison suggests that Ms. Freemire opened the store later than scheduled more than 85% of the time and, thus, under Plaintiffs' analysis, was presumably overpaid for opening shifts by more than 4,750 minutes (or nearly 80 hours).  *See* Polsinelli Dec., ¶¶ 63-64.[9] Similar results are found when this type of individualized comparison is conducted for store closing shifts worked by Tammy Bate (an opt-in plaintiff and declarant), by way of example.  *Id.* at ¶¶ 67-69.  Again, however, this type of after-the-fact analysis simply does not account for the inherent unreliability of using the Company's alarm reports for timekeeping or payroll purposes.

In their motion papers, however, Plaintiffs have attempted to use such belated analyses not only in lieu of the Company's contemporaneous time records, but also in contravention of some of their own contemporaneous records regarding the amount of time that they claim to have worked.  In particular, Halten testified at length during her deposition about personal notes that she made regarding her hours worked on specific days during her employment with Stewart's (which she admitted were derived from a personal calendar that she kept at the time).  *See, e.g.,* Ex. 4, Halten Dep. 100, 136-38.  She testified that these notes, which Plaintiffs produced during discovery, represented an accurate summary of the times that she started and ended her shifts on the days in question.  *Id.*  But now, in complete contradiction of these notes and her deposition

---

[9] The Company submits that such a stark disparity (in favor of the employee) between the Company's time records and alarm reports further supports the fact that Stewart's does not have a practice of using the alarm reports for payroll purposes.

testimony, Halten has submitted a declaration in support of Plaintiffs' certification motion in which she claims that the alarm reports are a more accurate reflection of the hours that she worked five years ago, more so than even her own personal notes (which were drafted much closer to the events in question).  *See* Dkt. 63-16, pp. 5-12.

Halten admitted during her deposition that, on multiple occasions when she worked beyond her scheduled time closing the store, the schedule was accurately changed to account for that additional time.  But she now claims – based solely on the alarm reports – that her time was not accurately changed (despite the fact that the original change was consistent with her own personal records).  *Compare* Ex. 4, Halten Dep. 137-40 (testifying as to personal records regarding time worked on October 14 and October 24) *with* Dkt. 63-16, pp. 8-9, ¶¶59, 67 (alleging different work hours on those same dates).

Tacitly acknowledging the impropriety of contradicting her own contemporaneous records and deposition testimony, Halten asserts in her declaration that she "repeatedly stated during [her] deposition that [she] would need to review these items [i.e., schedules and alarm reports] to give an accurate answer."  *See* Dkt. 63-16, p. 5, ¶ 38.  This sworn statement is simply not true, however. Critically, at no point during her deposition testimony did Halten ever suggest or indicate in any way that she would need to look at store alarm reports to provide accurate answers to any of the questions being asked.  *See generally* Halten Dep. (attached in its entirety at Dkt. 63).  In fact, the phrase "alarm report" was not mentioned once during her entire deposition.  *Id.*  Accordingly, Halten's recent declaration relying solely on store alarm reports to contradict her prior sworn deposition testimony is not only ineffectual, it is also disingenuous.  For this reason, Defendant submits that Halten's declaration should be stricken and/or disregarded by the Court.

**D. There Is No Company-Wide Policy Requiring Employees to Report to Work Early For Shifts without Compensation**

Plaintiffs allege that they were required by their managers to report to work 10-15 minutes before their shift started and that they were not compensated for this time. Significantly, however, none of the named Plaintiffs could identify any written Company policy that required them to report to work early. *See, e.g.,* Ex. 3, Gregory Dep. 102-03; Ex. 4, Halten Dep. 84; and Ex. 5, Potter Dep. 83. That is because no such policy exists.[10] *See* Ex. 1, Carnevale Dec., ¶ 25.

To the contrary, the named Plaintiffs confirmed that any such requirement, to the extent it existed, was dictated only by their specific managers. *See, e.g.,* Ex. 3, Gregory Dep. 102-03; Ex. 5, Potter Dep. 83-84. In fact, Potter admitted that this practice was implemented on a "store-by-store basis" and confirmed that there was no such requirement at one of the stores in which he worked. *See* Ex. 5, Potter Dep. 87-88. Gregory testified that, while her manager told her to report to work early, she did not "know anything that happen[ed] in any other Stewart's stores." *See* Ex. 3, Gregory Dep. 103.

With regard to his own attendance, Potter testified that there were days that he was earlier than others and that there could have been days on which he was right on time and other days on which he was late. *See* Ex. 5, Potter Dep. 97-98. Potter further admitted that he "would have no idea" whether he reported to work early, late, or on time on any particular day. *Id.* at 99 (stating also that "[t]here's no way for me to remember something like that"). Potter also conceded that

---

[10] To the extent that Plaintiffs are attempting to claim that the "Hand Off Don't Run Off" language on the Company's schedules somehow shows that such a policy exists, the record evidence on this motion indicates that this is not the case. To the contrary, the Company has provided significant proof demonstrating that this suggested practice is merely intended as a brief exchange of information between employees during a shift change. *See, e.g.,* Ex. 1, Carnevale Dec., ¶26; Ex.17, Church Dec., ¶10; Ex. 26, Fleming Dec., ¶10; Ex. 52, Wade Dec., ¶10; Ex. 10, Baldwin Dec., ¶11; Ex. 24, Engler Dec., ¶9; Ex. 42, Porter Dec., ¶9; Ex. 22, Doran Dec., ¶9; Ex. 30, Greene Dec., ¶8; Ex. 9, Bagley Dec., ¶10; Ex. 13, Becker Dec., ¶10.

there would not be any repercussions if an employee failed to show up early for their shift.  *Id.* at 87.  Finally, Potter confirmed that he had been counseled by one of his managers in writing about the need to be on time for work and not "2-5 minutes late."  *Id.* at 90.

### E.  Stewart's Policies and Practices Regarding Employee Uniforms

At all relevant times, it has been (and continues to be) Stewart's policy to make available to all employees a sufficient number of wash and wear uniform items consistent with the average number of days per week that the employees worked.  *See* Ex. 1, Carnevale Dec., ¶ 29.  Consistent with this policy, if any employee felt that he or she needed additional uniform items, such items were available upon request.  *Id.*  While the Company did not regularly maintain business records reflecting the specific number of uniform items provided to each of the named Plaintiffs, the Company has a vested business interest in its employees having a sufficient number of uniforms to present a professional appearance for its customers.  *Id.*  As Stewart's Personnel Manual explains (*see* Ex. 1, Carnevale Dec., Ex. B, p. 7):

> [U]niforms add to your professionalism and let customers readily know who to deal with if they have questions.  Keeping everything in top-notch shape makes a favorable impression and gets every customer transaction off on the right foot, which makes everyone's job easier.  Stewart's provides hats, name badges, ribbons, shirts, aprons, and pendants to make it possible to create a professional and safe environment.

### F.  No Contract Existed Regarding Paid Breaks

In its Decision on Defendant's Rule 12(b)(6) motion, this Court rejected Plaintiffs' contention that the Company's alleged failure to provide sufficient paid breaks stated a viable claim under the New York Labor Law.  *See* Dkt. 41, p. 10-11.  Given that ruling, in a last-ditch effort to resurrect their paid break claim, Plaintiffs now assert that the Company's alleged failure to provide adequate breaks constituted a breach of contract – a claim that the Court previously rejected as well.  *See id.* at p. 12 (dismissing any purported breach of contract claim because

Plaintiffs failed to identify a binding agreement and failed to adequately allege damages).[11]

Plaintiffs have still failed to identify a break-related contract or agreement between the Company and any of the named Plaintiffs (let alone an entire class) that was allegedly breached. *See, e.g.,* Ex. 5, Potter Dep. 175 (admitting that he could not identify any contract that he had with the Company regarding breaks or any other contract with Stewart's).  Moreover, each of the named Plaintiffs admitted during their depositions that they were paid for all of their time at work, including break time.  *See* Ex. 3, Gregory Dep. 37; Ex. 4, Halten Dep. 162-63; and Ex. 5, Potter Dep. 142-43.  Thus, Plaintiffs have still failed to articulate any recoverable damages that they allegedly suffered as a result of the purported breach.  Notwithstanding these fatal flaws, through the present motion, Plaintiffs now seek to certify a class of all employees who "have suffered as a result of Defendant's breach of its promise regarding paid breaks to employees."  Dkt. 63.

### G.  Plaintiffs' Narrowed Call-In Pay Claims Relating to Plaintiff Gregory

In its Decision, this Court granted Defendant's motion to dismiss Plaintiffs' call-in pay claims with the sole exception of allegations made by Gregory that she attended mandatory meetings on two specific dates.  *See* Dkt. 41, pp. 13-14 (holding that Plaintiffs failed to plead "sufficient call-in pay claims for any other time or any employee").  In their Second Amended Complaint, Plaintiffs later added four additional dates on which they claim that Gregory was required to attend "mandatory meetings."  *See* Dkt. 46, ¶ 83.

During her deposition, however, Gregory testified that, because she was in school at the time, she had been excused by her store manager from attending regular "shop meetings," but

---

[11]  Defendant contends that this ruling, as well as all other unchallenged holdings in the Court's prior Decision (*see* Dkt. 41), now constitute the "law of the case" in this action.  *See Binghamton Masonic Temple v. Bares*, 1997 U.S. Dist. LEXIS 4202, at *7 (N.D.N.Y. Mar. 31, 1997) (holding that the "law of the case" doctrine controlled the pending motion to dismiss and declining to reconsider issues which the Court had already decided).

indicated that she was still required to attend "corporate meetings" whenever they were scheduled. *See* Ex. 3, Gregory Dep. 114-15.  She further testified that she ended up missing shop meetings during "most weeks" because of her class schedule.  *Id.* at 115.  As discussed in greater detail below, there is no plausible way that Plaintiffs can translate this unique set of individualized facts relating to such a narrow claim into a class action merely by asserting a claim on behalf a "fail-safe" class of all employees who "have been denied call-in pay under State law."  Dkt. 63.

### H.  Stewart's Compliance with the NYS Wage Theft Prevention Act

In compliance with New York State's Wage Theft Prevention Act ("WTPA"), during the relevant period, Stewart's employees were provided with compliant wage notices consisting of a full-page sheet of paper containing two, identical wage notices, which set forth, among other required information, the employees' regular and overtime pay rates.  *See* Ex. 1, Carnevale Dec., ¶30.  Moreover, it is the Company's established practice that one-half of the form is detached and given to the employee, while the other half of the paper is retained by the Company.  *Id.*

In this action, the named Plaintiffs expressly admit that they were provided with (and signed) one or more of these wage notices during their employment.  *See* Ex. 3, Gregory Dep. 108-09 and Ex. 8 (signed one); Ex. 4, Halten Dep. 41-43 and Exs. 2, 4 (signed two); and Ex. 5, Potter Dep. 46-54 and Exs. 3, 5 (signed two).  Despite these admissions, however, Plaintiffs still press their WTPA claim based solely on the allegation that they *may not* have been given a copy of the notices to keep for their own records.  *See* Ex. 4, Halten Dep. 158-59.  And they do so notwithstanding testimony from two of them acknowledging that they cannot recall whether or not they were given copies of the notices to take with them.  *See, e.g.,* Ex. 5, Potter Dep. 48-54 (admitting repeatedly that it is "possible" that he received half of the form); Ex. 4, Halten Dep. 47 (testifying that she could not recall whether she received half of the form back).

Notably, in the course of discovery in this case, at Plaintiffs' request, the Company

14

searched for and located several original (half-sheet) wage notices signed by Potter and Gregory. On February 4, 2016, counsel for Defendant contacted Plaintiffs' counsel and offered to make those original wage notices available for review and inspection. To date, Plaintiffs' counsel has not responded to this offer. *See* Polsinelli Dec., ¶72 and Ex. 63.

## ARGUMENT

### I. PLAINTIFFS' MOTION SHOULD BE DENIED BECAUSE IT SEEKS CERTIFICATION OF CLASSES WHICH ARE IMPERMISSIBLE FAIL-SAFE CLASSES AND ARE OTHERWISE UNASCERTAINABLE.

#### A. Plaintiffs' Proposed Classes Constitute Impermissible Fail-Safe Classes

This Court has previously denied class certification where, among other things, the class definition itself begged the very legal questions at issue in the case. *See, e.g., De La Cruz v. Gill Corn Farms, Inc.*, 2005 U.S. Dist. LEXIS 44675, 18-19 (N.D.N.Y. Jan. 25, 2005) (noting that plaintiffs' proposed class definition "begs the very legal question at issue in this case," and, thus, the Court "does not understand how anyone, let alone these particular proposed class members, can know whether they fall within this class," and until then, "it would be impossible to manage the class as to the overtime[] claims, making the "class definition [] unworkable."); *see also Jones-Turner v. Yellow Enter. Sys., LLC*, 2011 U.S. Dist. LEXIS 118564 (W.D. Ky. Oct. 11, 2011) (denying plaintiffs' motion for Rule 23 class certification and stating that "in order to ascertain who is a member of the class, the merits of each individual employee's claims would need to be reached, thus defeating the suggestion that class treatment would be appropriate."). Here, Plaintiffs' class definitions are classic examples of impermissible "fail-safe" classes and, thus, are not ascertainable.[12] A "fail-safe" class is a class that "cannot be defined until the case is resolved

---

[12] *See generally* Erin L. Gellar, *The Fail-Safe Class as an Independent Bar to Class Certification*, 81 Fordham L. Rev. 2769, 2782 (April 2013) (noting that a class definition "creates a fail-safe class when the class definition bases membership in the class on the validity of plaintiff's claims.

on its merits."  *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 538 (6th Cir. 2012) (citation

omitted).  Plaintiffs' proposed classes suffer from the same fatal defect that existed in the above

cases – i.e., they beg the very legal questions at issue in the case.

> Again, Plaintiffs define their Rule 23 classes as all individuals who:

> (a) have been denied overtime compensation under State and Federal Law, (b) have
> been denied "gap" time pay for off the clock work under State law, (c) have been
> denied uniform maintenance pay under State law, (d) have been subjected to wage
> disclosure violations pursuant to New York Labor Law 195.1, (e) have suffered as
> a result of Defendant's breach of its promise regarding paid breaks to its employees,
> and (f) have been denied call-in pay under State law.

*See* Dkt. 63.  But such circular class definitions are insufficiently definite to permit the Court to

determine whether individuals are members of the purported classes.  To determine who is a

member of Plaintiffs' proposed classes, the Court must first determine the underlying merits of

each putative class members' claims.  The Court should deny Plaintiffs' motion for Rule 23 class

certification on this basis alone.[13]

### B.   Plaintiffs' Proposed Classes Are Unascertainable for Additional Reasons

> Further, by arguing that all employees are in the proposed classes, those classes are

unascertainable and overbroad. The Second Circuit, along with other Circuits, recognizes and

requires plaintiffs to satisfy Rule 23's "implied requirement of ascertainability."  *Brecher v.*

*Republic of Argentina*, 802 F.3d 303, 304 (2d Cir. 2015) (citations and quotation marks omitted).

The *Brecher* Court recently clarified that "the touchstone of ascertainability is whether the class is

---

Stated differently, for a class definition to create a fail-safe class, the definition must be framed in
terms of the defendant's ultimate liability or the central legal issue in the plaintiff's claims.").

[13] *See Zarichny v. Complete Payment Recovery Servs.*, 80 F. Supp. 3d 610, 623-26 (E.D. Pa.
2015) (granting defendants' motion to strike the class allegations because plaintiff's class
definitions created impermissible fail-safe classes); *see also Randleman v. Fid. Nat'l Title Ins. Co.*,
646 F.3d 347, 352 (6th Cir. 2011) (recognizing the ascertainability requirement as an "independent
grounds for denying class certification," before analyzing the predominance requirement which,
ultimately, was the district court's basis for decertifying the class).

'sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member.'" *Id.* (citations omitted).  This means that the class must be "defined by objective criteria" and the process for determining class membership cannot "require a mini-hearing on the merits of each case." *Id.* at 305 (citation and quotation marks omitted).[14]

Further, "[t]he class must…be defined in such a way that anyone within it would have standing." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006).  Federal courts have recognized that, if a class definition is "so broad that it sweeps within it persons who could not have been injured by the defendant's conduct, it is too broad." *Kohen v. Pac. Inv. Mgmt. Co. LLC & PIMCO Funds*, 571 F.3d 672, 677 (7th Cir. 2009).

Here, Plaintiffs' expansive inclusion of all employees who work or have worked during the statute of limitations period who have been subjected to a legal violation or suffered an alleged contract breach is simply not ascertainable.  For instance, there is no way for the Court to ascertain, on a class basis, who in the proposed class was allegedly denied uniform maintenance pay under State law.[15]  Although Stewart's does not keep a written record of the number of uniforms provided to each and every individual employee, it is undisputed that wash and wear shirts and tops are made available to all stores for employees.  While some of the named Plaintiffs (and their declarants) have alleged that they may not have received "sufficient" uniforms to cover the average number of days that they worked in certain workweeks, whether someone received "sufficient"

---

[14]  *See also* 5-23 Moore's Federal Practice - Civil § 23.21 (noting that "[t]here can be no class action if the proposed class is 'amorphous' or 'imprecise'") (citation omitted).

[15]  Notably, under the 2011 New York State Hospitality Wage Order, which Plaintiffs allege applies in this case, an employer is not required to pay the weekly uniform maintenance pay where the required uniforms: (1) are made of "wash and wear" materials; (2) may be routinely washed and dried with other personal garments; (3) do not require ironing, dry cleaning, daily washing, commercial laundering, or other special treatment; and (4) are furnished to the employee in *sufficient number . . . consistent with the average number of days per week worked by the employee*. 12 NYCRR § 146-1.7(b) (emphasis added).

numbers of shirts for the "average number of days per week worked" is simply not ascertainable. In fact, Stewart's has offered numerous statements from declarants indicating that they were provided with more than enough uniforms.[16]   Regardless, there is no objective means of demonstrating how many uniforms each individual employee received in order to compare this number with the employee's average number of days per week without conducting an individualized inquiry into each employee's unique circumstances, which would necessarily require obtaining information directly from each class member.[17]   As a result, Plaintiffs' claim in this regard is not ascertainable, and the proposed class includes individuals who suffered no injury and thus have no standing.

Additionally, ascertainability is absent when merely supported by declarations based on memory and when class membership turns on whether a particular document was received.  *See, e.g., Ault v. J.M. Smucker Co.*, 310 F.R.D. 59, 64-67 (S.D.N.Y. 2015) (finding proposed class unascertainable and denying certification where the class definition hinged on which particular product label consumers purchased, and plaintiff proposed relying on declarations from putative

---

[16]   *See, e.g.,* Ex. 22, Doran Dec., ¶15 ("15 uniform shirts"); Ex. 30, Greene Dec., ¶14 ("15 shirts"); Ex. 31, Harwood Dec., ¶15 ("7-10 shirts"); Ex. 19, Cummings Dec., ¶15 ("at least six polo shirts"); Ex. 56, Zinnershine Dec., ¶16 ("approximately 10 polo or golf-type uniform shirts"); Ex. 38, McLaughlin Dec., ¶19 ("1-2 fleece sweaters and approximately 6 polo or golf-type uniform shirts"); Ex. 40, Obermier Dec., ¶19 ("2 fleece sweaters and approximately 20 polo or golf-type uniform shirts").

[17]   While Plaintiffs cite to *Roach v. T.L. Canon* in their Memorandum, the facts at hand are distinguishable from those presented in *Roach*.  Pls. Memo., p. 18.   In *Roach*, this Court held that, simply because a review of the employer's business records might be required in order to establish who is in the proposed class, that fact alone does not render the class unascertainable.  *Roach*, 2015 U.S. Dist. LEXIS 177286 at *10 (citation omitted). In contrast, in the present case, there is no objective documentation that demonstrates, on its face, who, in fact, is in Plaintiffs' proposed classes.   Rather, such a determination can only be made after an individualized analysis is conducted into the facts and circumstances unique to each employee.

class members setting forth their purchase history).[18]  Here, at least in part, Plaintiffs' wage notice

claims under the WTPA would turn on exactly this type of evidence – *e.g.*, what type of wage

notice each employee was given and under what circumstances.  Ascertaining who might possibly

fall within Plaintiffs' proposed class for alleged wage notice violations is further complicated by

the fact that New York Labor Law 198(1-b) provides a complete defense to penalties where an

employer "made complete and timely payment of all wages due."  NYLL §198(1-b).  Without

discussing the merits of this claim, Defendant asserts that the likelihood of establishing a defense

as to all or most members of the proposed wage notice class demonstrates, at the very least, that

Plaintiffs' proposed class definition is not ascertainable.  Finally, many declarants received their

wage notices, which once again establishes the overbreadth of Plaintiffs' proposed class.  *See, e.g.*,

Ex. 16, Breason Dec. ¶6; Ex. 23, Dugan Dec. ¶6; Ex. 30, Greene Dec. ¶6; Ex. 35, Jones Dec. ¶6.

Significantly, all of Plaintiffs' proposed fail-safe classes – regardless of the alleged legal

violations on which they are based – suffer from the same defects of ascertainability and inclusion

of individuals who suffered no injury.  Plaintiffs' motion for Rule 23 class certification should be

denied, in its entirety, as a consequence of these defects.  *See, e.g., Jones-Turner*, 2011 U.S. Dist.

LEXIS 118564, at *8-10 (denying Rule 23 class certification because plaintiffs' proposed class

was not ascertainable).

## II.   EVEN IF THE COURT DETERMINES THAT PLAINTIFFS' CLASSES ARE NOT BARRED AS IMPERMISSIBLE FAIL-SAFE CLASSES AND ARE OTHERWISE ASCERTAINABLE, PLAINTIFFS STILL CANNOT SATISFY THE REQUIREMENTS OF FED. R. CIV. P. 23(A) OR 23(B).

Even if the Court determines that Plaintiffs' proposed classes survive the fatal defects set

forth above, Plaintiffs' motion should still be denied because Plaintiffs cannot satisfy the class

---

[18]  *See also Weiner v. Snapple Bev. Corp.*, 2010 U.S. Dist. LEXIS 79647, at *38-42 (S.D.N.Y. Aug. 3, 2010); *Carrera v. Bayer Corp.*, 727 F.3d 300, 307 (3d Cir. 2013).

action prerequisites under either Rule 23(a) or Rule 23(b). As discussed above, in 2011, the Supreme Court raised the bar for plaintiffs seeking class certification by requiring district courts to conduct a "rigorous analysis" to determine whether each prerequisite for certification is met. *Dukes*, 131 S. Ct. at 2551. This "rigorous analysis," the Court explained, frequently "will entail some overlap with the merits of the plaintiff's underlying claim." *Id.* Two years later, the Supreme Court confirmed that Rule 23 "imposes stringent requirements for certification that in practice exclude most claims." *Am. Express Co. v. Italian Colors Rest.*, 133 S. Ct. 2304, 2310 (2013). As the Court explained that same year, these requirements are consistent with the principle that "[t]he class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013) (citation and quotation marks omitted). This case is not an exception to the rule. In a case like this, where the plaintiffs primarily seek to recover monetary damages, to qualify for this exceptional method of litigation, Plaintiffs must satisfy Rule 23(a)'s prerequisites of numerosity, commonality, typicality, and adequacy of representation, as well as Rule 23(b)(3)'s requirements of predominance and superiority. *See Johnson v. Nextel Communs. Inc.*, 780 F.3d 128, 137 (2d Cir. 2015). Significantly, Plaintiffs bear the burden of demonstrating by a preponderance of the evidence that each of these Rule 23 requirements is satisfied. *Id.* at 137. As demonstrated below, when the record evidence on this motion is examined under those rigorous standards, it is clear that Plaintiffs fall far short on nearly every requirement under Rule 23.

As an initial matter, the "evidence" relied upon by Plaintiffs is tenuous and provides no material support for class-based treatment in this litigation. For instance, Plaintiffs' Attorney Declaration in Support of Class Certification ("Plaintiffs' Attorney Declaration"), despite having 14 attached exhibits, fails to contain even one direct citation to any portion of the record. Instead,

Plaintiffs' Attorney Declaration merely contains a host of unsubstantiated factual assertions, without any cited supporting authority, leaving the Court and Defendant to wade through hundreds of pages of exhibits, including deposition transcripts attached in their entirety, to speculate as to which documents and/or testimony Plaintiffs might be referring in support of their class allegations. *See generally Degelman Indus. v. Pro-Tech Welding & Fabrication, Inc*., 2011 U.S. Dist. LEXIS 147953, *11 (W.D.N.Y. Dec. 23, 2011) (noting that "courts will strike attorney affidavits or declarations where the documents are rife with argument, seek to introduce inadmissible evidence, or contain unsubstantiated factual averments") (citations omitted).

Moreover, the declarations upon which Plaintiffs rely heavily are largely made up of general, boilerplate assertions, diminishing their evidentiary value.[19]  *See Augustyniak v. Lowe's Home Ctr., LLC*, 2016 U.S. Dist. LEXIS 15112, at *9-10 (W.D.N.Y. Feb. 8, 2016) (stating that declarations submitted by opt-in plaintiffs "do not come close" to satisfying their similarly situated evidentiary requirement, as they are essentially identical to one another, which severely undercuts their persuasive value) (citations omitted).  In contrast to Plaintiffs' unsubstantiated assertions and conclusory declarations, as demonstrated above, a thorough review of the three named Plaintiffs' own deposition testimony illustrates that they are not even similarly situated to one another in many significant ways.  It also shows that the named Plaintiffs' allegations, including those made in their recent declarations in support of this motion, are unreliable and not credible in a number of material respects.

---

[19]  A number of these boilerplate assertions are simply not accurate.  *See, e.g.,* Ex. 1, Carnevale Dec., ¶11 (noting that of the 13 declarants who claim to have worked in a store that sold pizza, only 2 actually did).

### A.    Plaintiffs Have Not Cited Sufficient Evidence to Establish Numerosity Under Rule 23(a)(1)

Plaintiffs are "obligated to submit evidence to prove by a preponderance of the evidence each of the Rule 23 requirements." *Roach v. T.L. Cannon Corp.*, 2015 U.S. Dist. LEXIS 177286 at *3 (N.D.N.Y Sept. 4, 2015).  Here, Plaintiffs have failed to provide sufficient evidence to establish numerosity under Rule 23(a)(1).  Plaintiffs' Memorandum contains a mere three sentences addressing this issue, concluding in circular fashion that because Plaintiffs estimate the size of the class to be "approximately 16,000 current and former . . . employees . . . numerosity is easily met in this case." *See* Pls. Memo., pp. 16-17.  Despite Plaintiffs' conclusory assertion, however, Plaintiffs again fail to offer any actual evidence, other than 18 cookie-cutter declarations, to establish that they have satisfied this requirement.  Instead, Plaintiffs assume that virtually every single non-exempt employee suffers or suffered from all of the same violations as alleged in their papers and, thus, because Defendant employs thousands of non-exempt employees, this requirement is easily met.  But Defendant has offered contrary evidence proving that this is not the case, including 50 declarations by individuals confirming otherwise.  Plaintiffs' mere allegations regarding the estimated class size at issue, without adequate proof, does not suffice to establish numerosity under Rule 23(a)(1).

### B.    Plaintiffs Cannot Demonstrate Commonality under Rule 23(a)(2)

Plaintiffs argue in conclusory fashion that, because every putative class member was (or currently is) employed by Stewart's and subject to its wage and hour policies and practices "as well as their pay, overtime pay, uniform reimbursement, wage handout, and all other personnel policies," every single claim is "therefore common and typical of each other as resolution will require analysis into what steps defendant took to comply with wage and hour laws." *See* Pls. Memo., p. 18.  Tellingly, Plaintiffs fail to cite the standard for commonality enunciated by the

Supreme Court in *Dukes*, let alone demonstrate that their proposed classes satisfy that standard. In *Dukes*, the Supreme Court specifically warned that the commonality requirement of Rule 23(a)(2) "is easy to misread, since any competently crafted class complaint literally raises common questions." *Dukes*, 131 S. Ct. at 2551 (internal quotation and alteration marks omitted). The Court further clarified that the commonality requirement "does not mean merely that [class members] have all suffered a violation of the same provision of law." *Id.* Instead, commonality exists only if the claims of all class members "depend upon a common contention" that is "capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* Thus, "[t]he determining factor is not whether common questions exist, but rather 'the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation.'" *Ault v. J.M. Smucker Co.*, 310 F.R.D. at 66 (quoting *Dukes*, 131 S. Ct. at 2551); *see also Glatt*, 811 F.3d at 539 ("Because the most important question in this litigation cannot be answered with generalized proof on this record . . . we vacate the district court's order certifying [plaintiff's] proposed class.").

In their motion, Plaintiffs do not even identify common questions that purportedly exist, let alone demonstrate that common answers to such questions can be generated on a classwide basis. Rather, Plaintiffs merely seek to certify claims for certain individuals whom they allege were subjected to similar violations of the law. *See* Pls. Memo., p. 2. The Supreme Court in *Dukes* specifically rejected this type of claim as insufficient to establish commonality. *See Dukes*, 564 U.S. at 350 ("Commonality requires the plaintiff to demonstrate that the class members "have suffered the same injury. . . [t]his does not mean merely that they have all suffered a violation of the same provision of law.") (citations and quotations omitted). In short, *Dukes* specifically precludes certification of the types of classes sought by Plaintiffs here.

While one can only speculate as to what common questions Plaintiffs are implying exist, there can be no common answers given the unique facts underlying each of Plaintiffs' claims. Critically, there is no Company policy or practice which answers the essential questions raised by this litigation in a uniform manner. Indeed, the record evidence on this motion plainly shows that the key facts underlying each class member's claims vary widely, which will inevitably lead to different answers to any common questions that might exist.

For instance, with respect to Plaintiffs' "off-the-clock" claims, the named Plaintiffs readily admit that they understood that Stewart's timekeeping policy instructs employees to change the store schedule to reflect all hours worked, which each of them followed. This simply does not establish that a common policy or plan for off-the-clock work exists at the Company. *See White v. Baptist Mem. Health Care Corp.*, 2011 U.S. Dist. LEXIS 52928, *32 (W.D. Tenn. May 17, 2011) ("Where employees sometimes use procedures to report time worked outside their normal shifts, but neglect to do so for all time worked, an employer has no reason to know of the unreported time."); *see also White,* 699 F.3d at 877; *Fairchild*, 811 F.3d at 781-83.

Furthermore, the record evidence relating to Plaintiffs' "off-the-clock" claims clearly demonstrates that the circumstances under which each employee changed their time (or failed to do so) are unique and individualized. This is true not only as it relates to different employees, but also as it relates to different instances involving the same employees requiring an individualized, week-by-week analysis to determine whether any alleged violation actually occurred.

As with their off-the-clock claims, Plaintiffs' remaining proposed classes likewise fail to satisfy Rule 23(a)(2)'s commonality requirement. Clearly, there is no generalized proof that could be used to demonstrate issues such as how many uniforms each employee received, the circumstances under which each employee signed a wage notice, whether they attended a meeting

for which they claim not to have been properly paid (including whether any such meeting was "regularly scheduled"), or whether they were denied a break on any given day (and suffered any harm as a result).[20]  In the absence of such generalized proof to provide common answers to key questions in the litigation, both the Supreme Court and the Second Circuit have made it clear that class treatment is entirely inappropriate.  *See Dukes*, 131 S. Ct. at 2551; *Glatt*, 811 F.3d at 539.

### C.     Plaintiffs Cannot Demonstrate Typicality and Adequacy

Plaintiffs also cannot satisfy Rule 23(a) because their claims are not typical of those of the putative class members whom they seek to represent, and for that reason and others, they also are not adequate class representatives.  Rule 23(a)(3) requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class," meaning that their claims "arise[] from the same course of events, and each class member [] make[s] similar legal arguments to prove the defendant's liability."  *Rapcinsky v. Skinnygirl Cocktails, LLC*, 2013 U.S. Dist. LEXIS 5635, at *12 (S.D.N.Y. Jan. 9, 2013) (quoting Rule 23(a)(3) and *Marisol v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997)).  This requirement "goes to the heart of a representative party's ability to represent a class."  *Id.* at *18 (alteration marks omitted).  Accordingly, "where the particularities of the lead plaintiff's own allegations separate his claim from those of other putative class members, a court may not certify the class."  *Id.* at *15.  Similarly, Rule 23(a)(4)'s adequacy prerequisite mandates that "the named plaintiffs [] possess the same interests and suffer the same injur[ies] as the class members."  *Literary Works in Elec. Databases Copyright Litig. v. Thomson Corp.*, 654 F.3d 242, 249 (2d Cir. 2011) (quotation and alteration marks omitted).  Other "factors that the Court should consider to determine whether the absent class is adequately represented

---

[20]  Indeed, as previously noted, to the extent that any *individualized* (rather than common) proof even exists on these issues, it would no doubt be limited to the recollections, if any, of each putative class member pertaining to a vast number of days and events that occurred years before.

include [] whether the proposed plaintiffs are credible, … have adequate knowledge of the case[,] and are actively involved." *Spagnola v. Chubb Corp.*, 264 F.R.D. 76, 95 (S.D.N.Y. 2010) (internal citations omitted).  Plaintiffs cannot satisfy either of these Rule 23(a) standards – i.e., typicality or adequacy.

As for Rule 23(a)(3)'s typicality requirement, a review of the named Plaintiffs' own testimony makes it clear that their work experiences and claims are not even typical of each other. For instance, Gregory worked as a partner in a part-time capacity for a mere four months at only one of the Stewart's 300-plus stores.  *See* Ex. 3, Gregory Dep. 14, 22-23, 28.  Similarly, Halten worked as a partner with the Company for only seven months – primarily in one location.[21]  In contrast, Potter worked at Stewart's over a period of years at several different locations – at which, according to him, there existed disparate practices with respect to how the stores were managed. *See, e.g.,* Ex. 5, Potter Dep. 87-88.  During his most recent period of employment with the Company (*i.e.*, after he applied for reemployment following a two-year hiatus), Potter worked as an assistant manager and manager trainee.  *See* Ex. 5, Potter Dep. 181-82.

In addition to these disparate work experiences, the named Plaintiffs' allegations in this case also differ in significant ways.  For example, as noted above, while Gregory and Halten allege that, on occasion, their individual store managers discouraged them from changing the schedule, Potter testified that no manager ever told him that he should not change his time or that he would not be paid.  Similarly, although Gregory claims that she was not given a copy of the WTPA-compliant wage notice that she signed for her own records, Potter and Halten concede that they cannot recall whether they were given copies of the notices that they signed.  And, while Gregory

---

[21]  Halten testified at her deposition that she occasionally worked shifts at other stores but the only store in which she alleges that she was not paid accurately was the New Lebanon store.  *See* Ex. 4, Halten Dep. 154-55.

and Potter claim that they did not receive a sufficient number of uniforms, Halten admits that she ultimately obtained more than enough uniforms to cover the workweek.  *See* Ex. 4, Halten Dep. 78-80.  As these examples clearly demonstrate, the named Plaintiffs' claims are not typical of each other, let alone the thousands of employees whom they purport to represent.

For these reasons, Plaintiffs not only fail to satisfy Rule 23(a)(3)'s typicality requirement, but they also fail under Rule 23(a)(4)'s adequacy requirement.  In addition, as discussed above, inconsistencies and contradictions between the declarations submitted by the named Plaintiffs in support of this motion and their prior sworn deposition testimony also call into serious question the credibility of Halten and Potter, likewise rendering them inadequate class representatives.

### D.   Plaintiffs Cannot Satisfy the Requirements of Rule 23(B)(3)

In addition to satisfying the prerequisites of Rule 23(a), which Plaintiffs have failed to do, Plaintiffs must also satisfy one of the requirements of Rule 23(b).  *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997).  In a case like this, where Plaintiffs primarily seek money damages, a class will be certified only if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  Plaintiffs cannot satisfy either requirement.

#### i.   Plaintiffs Cannot Show That Common Issues Predominate

"Rule 23(b)(3)'s predominance requirement is 'more demanding than Rule 23(a).'" *Johnson, supra*, 780 F.3d at 138 (citations omitted).  Predominance requires that a court analyze whether "the common issues can profitably be tried on a classwide basis, or whether they will be overwhelmed by individual issues."  *Id.*  As the Second Circuit properly framed this analysis:

> Like the commonality inquiry, a court examining predominance must assess (1) the "elements of the claims and defenses to be litigated;" and (2) "whether generalized evidence could be offered to prove those elements on a class-wide basis or whether

individualized proof will be needed to establish each class member's entitlement to relief."

*Id.* (citing McLaughlin on Class Actions § 5:23).

Here, Plaintiffs claim that they have met this predominance standard with respect to their off-the-clock claims because a variation in the number of hours worked purportedly goes to the question of damages and is not enough to defeat predominance. *See* Pls. Memo., p. 20. But that simply is not the proper analysis. The standard for establishing predominance under Rule 23(b)(3) is even more "demanding than the commonality requirement of Rule 23(a)" (which, as shown above, Plaintiffs cannot satisfy) and requires caution, particularly when there are large disparities among class members. *Doyel v. McDonald's Corp.*, 2010 U.S. Dist. LEXIS 81910, at *7 (E.D. Mo. Aug. 12, 2010). In *Doyel*, the plaintiffs alleged that the defendant failed to pay its employees for all time worked, including allegations that the defendant encouraged employees to work before clocking in, during breaks, and after their shifts, and failed to compensate them for time spent maintaining their uniforms. The court held that there was no common evidence that could make out a prima facie showing of such a violation. *Id*. at *21-22. Similarly, here, this Court cannot determine on a classwide basis whether an employee was required to perform any particular work off-the-clock on any given day. *See id*. at *22-23 (stating that "[t]he Court cannot determine on a classwide basis" whether an employee was required to perform off-the-clock work because "[t]hese are questions of fact that will differ for each plaintiff, and would require an examination by the Court of individual circumstances of each alleged instance") (citations omitted). The court in *Doyel* also analyzed the plaintiffs' alleged uniform maintenance pay violation, finding that common questions "do not predominate over individual questions on plaintiffs' uniform claim because the nature of the evidence plaintiffs would have to use to resolve the question of liability

varies from class member to class member." *Id.* at *27.[22]  Thus, the court found that class

certification as to these issues was not appropriate.  The same result is warranted here.

Finally, as to Plaintiffs' claim that they were unable to take an uninterrupted meal break

and, thus, have suffered in some way as a result of a breach of an alleged promise, this too presents

individualized issues that cannot be resolved on a classwide basis.  *See, e.g.*, *Hawkins v. Securitas*

*Sec. Servs. USA, Inc.*, 280 F.R.D. 388, 400 (N.D. Ill. 2011) ("Whether any particular Securitas

officer could take an uninterrupted meal break presents individualized issues.").  Such

individualized inquiries overwhelm any efficiencies gained by trying common issues in a class

proceeding and, thus, Rule 23(b)(3) is not satisfied.  *Id*. at 33 (quotations and citations omitted).

In apparent support of their predominance argument, Plaintiffs cite to a recent district court

case from this Circuit, *Briceno v. USI Servs. Group, Inc.*, 2015 U.S. Dist. LEXIS 132185

(E.D.N.Y. Sept. 29, 2015), and suggest that the issues raised in that case are "nearly identical" to

the issues raised here.  *See* Pls. Memo., p. 21.  As explained below, however, that is not the case.

First, it is critical to note that the *Briceno* decision did not address Rule 23 certification of

*any* class, rendering the case inapposite to Plaintiffs' current Rule 23 motion.[23]  *See Briceno*, 2015

U.S. Dist. LEXIS 132185, at *3.  Instead, applying a different standard, that decision addressed

the issue of whether the case should be decertified as a collective action under the FLSA.

In addition to this important legal distinction, a review of the relevant facts in *Briceno*

---

[22] The court reasoned that, even assuming plaintiffs were entitled to compensation for time spent maintaining their uniforms, each employee spends a different amount of time doing so, and furthermore, because the number of days per week each class member works differs, and the number of uniforms per class member differs, the compensation for the task of cleaning and pressing a uniform varies significantly from class member to class member, and *even* for a single class member, from week to week.  *See Doyel*, 2010 U.S. Dist. LEXIS 81910, at *27-28.

[23] In fact, the court in *Briceno* previously denied plaintiffs' motion to certify a class under Rule 23.  *See Briceno*, 2015 U.S. Dist. LEXIS 132185, at *6-7.

demonstrates that it is also distinguishable from this case in a number of other material respects. In *Briceno*, Plaintiffs brought a putative class and collective action for failure to pay wages and overtime compensation and moved for partial summary judgment solely as to the employer's alleged failure to compensate plaintiffs for missed meal breaks. *Id.* at *7. Reviewing plaintiffs' motion for partial summary judgment, the court noted that, in the Second Circuit, it is not *per se* unlawful for an employer either to have an automatic meal break deduction policy or to "'shift the burden to their employees to report that they worked during an unpaid meal break.'" *Id.* at *23 (citations omitted).[24] Here, Stewart's does not utilize any automatic deduction software for meal breaks and, in fact, it is undisputed that employees are paid for all of their breaks.[25]

Moreover, unlike in *Briceno*, there is no centralized Company policy in existence that resulted in the incorrect calculation of employee hours or pay.[26] Rather, the named Plaintiffs have testified that they did, in fact, change their schedules to accurately reflect their actual hours worked on multiple occasions and only sometimes, for various reasons, failed to do so. Thus, any hours

---

[24] The employer in *Briceno* utilized a telephonic timekeeping system, whereby each employee was assigned a PIN and given an 800 number to call at the beginning and end of their shifts. *Id.* at *12. This system automatically deducted meal breaks. *Id.* at *13. The plaintiffs alleged that they were not consistently paid for all hours worked, specifically because the MITC telephonic system was defective. Further, there were allegations by plaintiffs that supervisors were falsifying employees' time records by using "ghost employees" to receive additional compensation. The plaintiffs alleged that the supervisors would not inform defendants when an employee had quit or was fired and would instead hire new employees and assign them to the departed employee's PIN or allow existing employees to use the departed employee's PIN, in order to receive checks and pay the so-called "ghost employees" in cash. *Id.* at *16-21.

[25] *See, e.g.,* Ex. 13, Becker Dec., ¶15; Ex. 34, Husfelt Dec., ¶15; Ex. 31, Harwood Dec., ¶14; Ex. 19, Cummings Dec., ¶14; Ex. 56, Zinnershine Dec., ¶15; Ex. 27, Fishlock Dec., ¶14; Ex. 44, Rundberg Dec., ¶14; Ex. 22, Doran Dec., ¶14; *see also* Ex. 3, Gregory Dep. 37; Ex. 4, Halten Dep. 162-63; and Ex. 5, Potter Dep. 142-43.

[26] The *Briceno* court ultimately denied defendants' motion to decertify the FLSA collective, at least in part, because all employees in that case were subjected to a single, centralized telephonic timekeeping system which was defective, as well as a centralized complaint system, which was also found to be defective, leading to the alleged miscalculation of wages. *See* Briceno, 2015 U.S. Dist. LEXIS 132185, at *34-39.

not accurately recorded are not the result of a uniform, defective system, but rather individualized circumstances resulting in a purported deviation from the Company's well-established timekeeping policies and procedures.  The above analysis plainly shows that the *Briceno* decision (which, again, did not even address the applicable Rule 23 standards) offers no support for Plaintiffs' conclusory assertion that they have satisfied Rule 23(b)(3)'s predominance requirement.  This is true not only with respect to Plaintiffs' off-the-clock claims, but all of their remaining claims as well.

In this regard, there is simply no generalized proof that Plaintiffs can point to (and the Court can evaluate) to answer the key questions at issue here, such as (a) whether an employee worked any time on a given day that is not reflected on the Company's time records and, if so, why the Company's established timekeeping policies were not followed in that instance; (b) how many uniforms each employee received; (c) under what circumstances each employee was provided with a WTPA wage notice; (d) whether a meeting was held on any given day which an employee attended and recorded their time for, but was not properly compensated (including the issue of whether any such meeting was "regularly scheduled"); or (e) whether, on any given day, an employee took (or failed to take) a paid break.  Even assuming that the answers to any of these questions could establish liability with respect to any particular employee in any given instance, there is no way that such answers can be established with generalized proof, rather than through an intensely individualized analysis.  Thus, it is abundantly clear that individual issues predominate in this case and that Rule 23(b)(3) has not been (and cannot be) satisfied.

### ii.  Plaintiffs Cannot Demonstrate Superiority

As the Second Circuit recently held, "a class action is not a superior method of litigating" a case where, as here, "liability for a significant bloc of the class members and damages for the entire class must be decided on an individual basis."  *Johnson*, 780 F.3d at 148; *see also Spagnola*,

264 F.R.D. at 99 ("the greater the number of individual issues, the less likely that superiority can be established") (internal quotation and alteration marks omitted).  As the detailed analysis above makes clear, individual liability issues will predominate in this action, thus rendering class treatment completely unmanageable.  Further, even if liability could be established in any particular instance, the determination of the amount of damages any specific class members might be eligible to receive would devolve into a series of mini-trials.  For these reasons, a class action would be a far inferior method of adjudicating the claims at issue here.

## III.   THE OVERTIME CLASS DOES NOT QUALIFY FOR CERTIFICATION UNDER THE FLSA BECAUSE THEY ARE NOT SIMILARLY SITUATED.

The FLSA provides for collective actions through an "opt in" procedure.  *See* 29 U.S.C. § 216(b).  However, a collective action should proceed only where it will facilitate a court's ability to resolve multiple claims efficiently in one proceeding.  *See Hoffman-La Roche, Inc. v. Sperling*, 493 U.S. 165, 170 (1989).  Thus, section 216(b) provides that only similarly situated employees may utilize the opt-in procedure.  Courts in the Second Circuit apply a two-tiered approach when deciding whether an FLSA suit may proceed as a collective action.  *See Myers v. Hertz Corp.*, 624 F.3d 537, 554 (2d Cir. 2010).  At the first stage of this two-tiered process, which typically occurs before the close of discovery, the court undertakes examination of plaintiff's pleadings and affidavits to determine whether the plaintiff and the other members of the proposed class are sufficiently "similarly situated" to warrant the issuance of notice to putative class members and to permit it to proceed as a collective action through discovery.  *See Fengler v. Crouse Health Found., Inc.*, 595 F. Supp. 2d 189 (N.D.N.Y. 2009).

Critically, however, the standard governing this first (or conditional) stage of the certification process is generally applied by the court *before* discovery closes.  But where discovery has already closed (as will be the case here by the time this motion is heard), the court should apply

a more stringent standard, which requires that the plaintiff demonstrate, based upon an established factual record, that a class of similarly situated individuals does, in fact, exist. *See, e.g., Zivali*, 784 F. Supp. 2d at 460.  Given the posture of this case, Defendant submits that the Court should apply this heightened, post-discovery standard to Plaintiffs' motion to certify an FLSA collective.

Regardless of which certification standard is applied (i.e., pre- or post-discovery), the record in this case plainly demonstrates that Plaintiffs have failed to meet their burden of establishing that they are similarly situated to the members of Plaintiffs' broadly defined federal overtime class. Indeed, as this Court has already held, the three named Plaintiffs in this action are not even similar to *each other* with respect to their purported overtime claims, let alone the thousands of other employees whom they seek to notify about this case.  *See* Dkt. 41 (granting motion to dismiss Gregory's overtime claims, but denying motion as to similar claims by Halten and Potter).

Moreover, because Plaintiffs' federal overtime claims are inherently based on their allegations that they worked off the clock and were not properly compensated, as discussed in detail above, an evaluation of those claims will necessarily require a highly individualized analysis into each employee's unique experiences and circumstances.  Notably, in ruling on Defendant's 12(b)(6) motion, this Court found that, while Plaintiffs' conclusory allegations that they worked overtime were insufficient to state viable claims, certain specific allegations outlining in detail each workweek in which Halten and Potter allegedly worked more than 40 hours were "sufficient to nudge [their] overtime claims beyond the *Lundy/Nakahata/DeJesus* threshold."  Dkt. 41, p. 6. Now Plaintiffs ask this Court to certify a class of thousands using nothing more than the same conclusory, non-specific allegations deemed insufficient to survive that motion.  Even in Plaintiffs' Second Amended Complaint, they were only able to identify *some* workweeks in which Halten and Potter alleged they worked more than forty hours per week, while Plaintiffs conceded that

33

Gregory has no viable overtime claim.  As with the named Plaintiffs, only those employees who are able to identify (with the specificity required by the Second Circuit) weeks in which they allegedly worked overtime without compensation will have potential claims, which the Court will then have to analyze week-by-week to determine on an individualized basis whether those individuals were, in fact, denied any compensation.[27]

This evaluation will also require an individualized inquiry into any unique defenses that the Company may have to such off-the-clock claims.[28]  For example, to state a successful off-the-clock claim, a plaintiff "must demonstrate that [the defendant] had actual or constructive knowledge of the off-duty work performed."  *Zivali*, 784 F. Supp. 2d at 467-68 (citations omitted).[29]  Similarly, Stewart's can also defend against such claims by demonstrating, for example, that any off-the-clock work was de minimis.  *See, e.g., Zivali* 784 F. Supp. 2d at 468 (noting that the potential defenses in the case were highly fact specific, including individualized assessments of whether certain work was de minimis).

Defendant respectfully submits that this Court should not allow this case to proceed as a representative action under the FLSA in the face of such overwhelming evidence demonstrating that collective treatment is inappropriate.  As one district court has held, "neither the remedial purposes of the FLSA, nor the interests of judicial economy, would be advanced if [the court] were to overlook facts which generally suggest that a collective action is improper."  *West v. Border*

---

[27]  Significantly, only a small percentage of all the non-exempt employees that Plaintiffs seek to certify even worked full time (i.e., more than 30 hours per week).  Specifically, greater than 75% of the Company's non-exempt partners are part-time employees.  *See* Ex. 1, Carnevale Dec., ¶13.

[28]  Courts have routinely held that claims for off-the-clock work are "too individualized to warrant collective action treatment."  *See, e.g., Diaz v. Electronics Boutique of Am., Inc.*, 2005 U.S. Dist. LEXIS 30382, at *16-17 (W.D.N.Y. Oct. 13, 2005) (citations omitted).

[29]  In the absence of a company-wide policy or practice, "plaintiffs . . . have to demonstrate that each individual manager had actual or constructive knowledge that plaintiffs were performing off-the-clock work without proper compensation."  *Zivali*, 784 F. Supp. 2d at 468.

*Foods, Inc.*, 2006 U.S. Dist. LEXIS 96963, at *21 (D. Minn. July 10, 2006) (denying motion for conditional certification) (citation omitted).  As another district court noted, "[i]t would be a waste of the Court's and the litigants' time and resources to notify a large and diverse class only to later determine that the matter should not proceed as a collective action because the class members are not similarly situated."  *Freeman v. Wal-Mart Stores, Inc.*, 256 F. Supp. 2d 941, 945 (W.D. Ark. 2003) (denying conditional certification); *see also Basco v. Wal-Mart Stores, Inc.*, 2004 U.S. Dist. LEXIS 12441, at *14 (E.D. La. July 2, 2004) (noting that "[t]o create a collective action class, including the cost associated with that when a Court is convinced that there is insufficient support for same prior to its certification[,] would be an exercise in futility and wasted resources for all parties involved").  For these reasons, and for all of the additional reasons demonstrating that this case is inappropriate for class treatment under Rule 23, Plaintiffs' motion for conditional certification of a collective action under the FLSA should be denied.

## CONCLUSION

For all of the foregoing reasons, Plaintiffs' certification motion should be denied, in its entirety, and the Court should refuse to certify any of Plaintiffs' proposed state-law Rule 23 classes, as well as their proposed federal overtime collective under the FLSA.

Respectfully submitted,

STEWART'S SHOPS CORP.


By:   */s/ William J. Anthony*
William J. Anthony, Esq.
JACKSON LEWIS, P.C.
18 Corporate Woods Blvd, 3rd Floor
Albany, NY 12211
P: (518) 434-1300
F: (518) 427-5956
AnthonyW@jacksonlewis.com

## <u>CERTIFICATION OF SERVICE</u>

I hereby certify that on April 22, 2016, copies of the Defendant's Memorandum of Law in Opposition To Plaintiffs' Motion for Class Certification and Collective Action, together with supporting papers were filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the court's CM/ECF System.

*/s/ William J. Anthony*
William J. Anthony